# FOR PUBLICATION

ATTORNEY FOR APPELLANTS:

**STEPHEN M. WAGNER**
Wagner Reese, LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEES:

**KEVIN C. SCHIFERL**
**LUCY R. DOLLENS**
**VANESSA A. DAVIS**
Frost Brown Todd, LLC
Indianapolis, Indiana

**FILED**
May 08 2013, 9:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

STACY SMITH and ROBERT SMITH, )
Individually and as Co-Personal )
Representatives of the ESTATE OF )
JOHNNY DUPREE SMITH, Deceased, )
)
    Appellants-Plaintiffs, )
)
          vs. )    No. 54A01-1204-CT-169
)
DELTA TAU DELTA, )
)
    Appelee-Defendant, )
)
BETA PSI CHAPTER OF DELTA TAU )
DELTA, WABASH COLLEGE and )
MARCUS MANGES, )
)
    Defendants. )

APPEAL FROM THE MONTGOMERY SUPERIOR COURT
The Honorable Donald L. Daniel, Special Judge
Cause No. 54D01-1009-CT-346

**May 8, 2013**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellants-Plaintiffs, Stacy Smith and Robert Smith, Individually and as Co-Personal Representatives of the Estate of Johnny Dupree Smith, deceased (the Smiths), appeal the trial court's summary judgment in favor of Appellee-Defendant, Delta Tau Delta, with respect to claims arising from the wrongful death of Johnny Dupree Smith (Johnny), a Wabash College freshman, following acute alcohol intoxication.[1]

We affirm in part, reverse in part, and remand for further proceedings.

## ISSUES

The Smiths raise two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by denying the Smiths' motion to strike certain designated evidence purporting to contain unsworn, unverified, and uncertified statements; and

(2) Whether the trial court erred in granting Delta Tau Delta's motion for summary judgment, finding that there is no genuine issue of material fact that an agency relationship existed between the national fraternity and its local chapter and that the national fraternity did not assume a duty to protect its freshmen pledges.

## FACTS AND PROCEDURAL HISTORY

---

[1] This cause comes before us as an appeal to the trial court's grant of summary judgment, instigated by Delta Tau Delta's motion. Although the Smiths filed an amended complaint, which also alleged several claims against Wabash College, Delta Tau Delta's local Beta Psi Chapter, and Marcus Manges, Beta Psi's risk manager, these parties did not join in the motion for summary judgment and accordingly are not before us on appeal. *See* Appellate Rule 17(A).

2

This cause comes before us as an appeal to the trial court's grant of summary judgment in an action arising from the wrongful death of a child following acute alcohol poisoning at the Delta Tau Delta fraternity house at Wabash College, Indiana.

## I. *The Events of the Fall of 2008*

In the fall of 2008, Johnny, originally from Tucson, Arizona was a college freshman at Wabash College, in Crawfordsville, Indiana. At the beginning of the fall semester, Johnny pledged at the Beta Psi Chapter of Delta Tau Delta and began living in the Beta Psi fraternity house, which was owned by the College. In the week leading up to Homecoming on October 4, 2008, the freshmen pledges were put through a "hell week" of hazing and sleep deprivation. (Appellant's App. p. 145). In one of these activities, Johnny was required to participate in Chapel Sing, an annual Wabash tradition the week of Homecoming where freshmen pledges of each fraternity house compete against each other to yell the Wabash school song the loudest. At practices for Chapel Sing, fraternity members routinely haze the freshmen pledges. Because Johnny failed to perform to the satisfaction of his fraternity brothers during the Chapel Sing competition on October 2, 2008, he had a large red W spray painted on him. In addition, the pledges were required to stay up into the early morning hours to build a Homecoming float and to clean the fraternity house kitchen wearing only an apron.

On Tuesday, September 30, 2008, Beta Psi's social chairman emailed the Delta Tau Delta pledges announcing a house party at the fraternity house the weekend of Homecoming at which there would be "an abundance of alcohol." (Appellant's App. p. 145). During this house party on October 4, 2008, Johnny began drinking beer at the

3

fraternity house shortly before 9 p.m. Throughout the evening, Johnny consumed multiple beers and several shots of hard alcohol. Later, after Johnny was visibly intoxicated, he was summoned to the first floor room of an upperclassman to participate in a "pledge family drink night." (Appellant's App. p. 147). As a condition of membership, freshmen pledges were required from time to time to drink alcohol with their fraternity families. While participating in the required family drink night, Johnny consumed numerous shots of hard alcohol. At approximately 10:30 p.m., Johnny left the room and shortly thereafter, he fell down a stairwell, cutting his lip, cheek, and chin. At that time, he was unable to walk and could barely talk.

At 11 p.m., Johnny's pledge brothers physically carried him to the upstairs bedroom. At the instruction of Delta Tau Delta's house risk manager, Johnny's mattress was taken off his top bunk and placed on the floor. Johnny was placed on his side "so he wouldn't choke on his vomit" and Stevan Stankovich (Stankovich), a freshman pledge, was ordered to keep an eye on him. (Appellant's App. p. 149). Around 11:30 p.m., Stankovich noticed Johnny's body to be limp, his breathing shallow, and his eyes remained open even though he was non-responsive. At around 2 a.m., Stankovich left the room to drive several drunken Delta Tau Delta alumni back to their hotel; he returned around 3:45 a.m. On October 5, 2008, at 8:45 a.m, when the pledges were awoken to clean up after the party, Johnny was found deceased, lying in a pool of his own vomit. The Montgomery County coroner later determined that, when he was found, Johnny had been dead for at least four to eight hours; and his blood alcohol content was nearly .40%.

II. *Delta Tau Delta*

4

The national fraternity, Delta Tau Delta, was founded in 1858 at Bethany College in West Virginia, and is now comprised of 131 local chapters and colonies in multiple countries. It is a non-profit corporation, with its central office located in Fishers, Indiana and comprised of a volunteer alumni board of directors. Although originally managed by its undergraduate members, in the late 19th Century the members determined they no longer had the ability to manage the fraternity effectively and they created and bequeathed power to the national organization.

Delta Tau Delta is governed by a constitution, bylaws, and member responsibility guidelines which promulgate policies, rules, and procedures for its local chapters. These rules encompass, among others, the rituals to be carried out by the local chapters, delineate the powers and duties of the local chapters' officers, prescribe discipline and process for expelling fraternity members, and describe the type of social events which are prohibited. Specifically, Delta Tau Delta mandates that

> [n]o chapter of Delta Tau Delta shall indulge in any physical abuse or undignified treatment (hazing) of its pledges or members. Hazing is defined as any action taken or situation created intentionally, whether on or off Fraternity premises, to produce mental or physical discomfort, embarrassment, harassment, or ridicule. Such activities and situations include paddling in any form, creation of excessive fatigue, physical and psychological shocks, quests, treasure hunts, scavenger hunts, road trips or any other such activities, kidnapping of actives by pledges or pledges by actives as well as the forced consumption of alcohol, wearing apparel which is conspicuous and not normally in good taste, engaging in any public stunts and buffoonery, morally degrading or humiliating games and activities, late work sessions which interfere with academic activity, and any other activities which are not consistent with Fraternal law, Ritual, or policy with the regulations and policies of the host educational institution.

(Appellant's App. p. 227).

5

In addition to its constitution and bylaws, the national fraternity adopted member responsibility guidelines which "provide a concise articulation of the responsibilities of each member, regarding alcohol, drugs, hazing, abusive behavior, and property management. Any violation of these criteria is viewed seriously by [Delta Tau Delta], and it is the responsibility of every undergraduate chapter member and volunteer to see that [t]he [g]uidelines are upheld." (Appellant's App. p. 233). In 1999, and as restated in 2007, Delta Tau Delta explicitly recognized "the well known dangers of alcohol and substance abuse", and adopted policy statements as part of its guidelines, reaffirming:

> the over arching principle that drunkennesss or other intoxication, and their associated behaviors by individual members, are unacceptable. Delta Tau Delta will first use education as a means to support appropriate behavior, but also recognizes that where such behavior places the Fraternity, an individual chapter or colony, or our Brothers at risk, it can be cause for suspension or expulsion from membership.. . . With the education of youth our primary objective, the Arch Chapter has adopted GreekLifeEdu as the Fraternity's alcohol education program. At a minimum, each new member of Delta Tau Delta will be provided and is expected to complete this program prior to the end of the term in which he is initiated. In addition, the Arch Chapter requires each chapter and colony to contact an alcohol and substance treatment organization in its area and arrange for a representative to address the chapter or colony on addiction and abuse issues each academic year.

(Appellant's App. p. 234). In addition, Delta Tau Delta prohibited the purchase of alcohol with fraternity funds, use of alcohol at rush, pledge, and initiation activities, drinking games, as well as kegs of beer and other common containers of alcohol.

The specific implementation procedures of these guidelines at local level prescribe that:

1. The chapter president, along with the risk management chairman and chapter advisor, shall communicate information on risk management and the [g]uidelines to the chapter on a regular basis.
2. The chapter president, along with the risk management chairman and chapter advisor, shall be responsible for advising and assisting the chapter in implementation, verification, and enforcement of [t]he [g]uidelines.
3. The chapter president, along with the new member educator shall be responsible to ensure that all new members complete [Delta Tau Delta's] approved alcohol education program during the academic term of their initiation.

(Appellant's App. p. 233).

To promulgate and enforce these rules, Delta Tau Delta enacted an hierarchical enforcement criteria and a complex enforcement program. Upon dividing violations of Delta Tau Delta's constitution, bylaws, and member responsibility guidelines into three levels, each level institutes its own sanction. Specifically, a level I violation—*e.g.*, failure to implement Delta Tau Delta's alcohol education program—triggers a response "determined and coordinated by [Delta Tau Delta's] Central Office staff;" while a level II violation—*e.g.* hazing, alcohol during pledge activities, and drinking games—may result in suspension of the member, fines, or suspension of the local chapter. (Appellant's App. p. 229). In its enforcement program, Delta Tau Delta also described the reporting process for potential violations, its investigation procedure, and subsequent sanctions.

To further regulate hazing and alcohol use at its local chapters, Delta Tau Delta implemented "Delts Talking About Alcohol." This program is designed to educate individual members as to how to recognize the signs of acute alcohol poisoning, and once recognized, how to properly handle the emergency. At the time of Johnny's death, Delta Tau Delta required all pledges to complete the program within the first semester of their

7

pledgeship. As of the evening of October 4, 2008, none of the members of Johnny's pledge class had completed the program.

To ensure compliance by the local chapter with its mandates, Delta Tau Delta relies on chapter consultants and chapter advisors. Chapter consultants periodically visit the local chapter to review its operations. If, during the visit, the chapter consultant observes conduct in violation of Delta Tau Delta's constitution, bylaws, or member responsibility guidelines, he advises his supervisor who is responsible to investigate the incident. A chapter advisor, on the other hand, is assigned to a local chapter by the national fraternity and is required to attend at least one chapter meeting a month to keep the national fraternity "fully and accurately informed of the affairs of the chapter." (Appellant's App. p. 184). At the time of Johnny's death, Beta Psi's chapter advisor was Doug Coy (Coy). As chapter advisor, he was expected to report any conduct violations to Delta Tau Delta as well as ensure that the local chapter complied with corrective actions ordered by the national fraternity and the new pledges completed the "Delts Talking About Alcohol" program. Coy was at the fraternity house on the evening of October 3, 2008 and again on the day of the Homecoming party, October 4, 2008.

During the existence of its local chapter at Wabash College, Delta Tau Delta has investigated and substantiated prior incidents involving hazing. Most recently, in the spring of 2007, a chapter consultant discovered a video showing Beta Psi members hitting other students with pledge paddles. After investigating the incident, Delta Tau Delta imposed corrective actions and sanctions on Beta Psi, including fines and a requirement to rewrite its bylaws to bring them current with existing Delta Tau Delta

8

policies and procedures. In addition, James Russell (Russell), Delta Tau Delta's executive vice president, and Jack Kreman, Delta Tau Delta's director of chapter services, informed the Beta Psi members that "the practice of pledge family oriented activities must cease immediately." (Appellant's App. p. 107).

### III. *Procedural History*

On September 22, 2010, the Smiths, individually and as representatives of Johnny's estate, initiated an action for the wrongful death of a child. On February 9, 2011, the Smiths filed an amended complaint against Delta Tau Delta, its local chapter Beta Psi, Wabash College, and Beta Psi's risk manager alleging hazing in violation of Ind. Code § 35-42-2-2, dram shop violations of I.C. § 7.1-5-7-8, and negligence. On July 29, 2011, Delta Tau Delta filed a motion for summary judgment claiming Beta Psi's individual members were not acting as agents of Delta Tau Delta and the national fraternity had not assumed a duty to the pledges of its local chapter to protect them from hazing and the danger of excessive alcohol consumption. Together with its motion, Delta Tau Delta designated, among other documents, Russell's affidavit and two unsworn and uncertified statements. On January 31, 2012, the Smiths filed a response, designated evidence, as well as a motion to strike Russell's affidavit and the two statements. On March 12, 2012, the trial court conducted a hearing on both motions. That same day, the trial court denied the Smiths' motion to strike. On March 23, 2012, the trial court summarily granted Delta Tau Delta's motion and entered final judgment against the Smiths.

The Smiths now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion to Strike*

The Smiths first contend that the trial court abused its discretion when it denied their motion to strike certain portions of Delta Tau Delta's designated evidence in support of the fraternity's motion for summary judgment. A trial court is vested with broad discretion in ruling on a motion to strike. *In re Fitz*, 778 N.E.2d 432, 436 (Ind. Ct. App. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances supporting the judgment for relief. *Id.*

In their motion, the Smiths attempted to strike three documents designated by Delta Tau Delta as contrary to the requirements of Ind. Trial Rule 56. Focusing on Russell's sworn affidavit, the Smiths assert that because certain, specified paragraphs contradict the affiant's subsequent deposition testimony, these contradictory portions of the affidavit should be stricken. In addition, the Smiths contend that the uncertified and unsworn statements purportedly made by two freshmen pledges to investigating police officers are inadmissible in summary judgment proceedings. We will analyze each contention in turn.

A. *Affidavit of James Russell, Executive Vice President of Delta Tau Delta.*

With respect to Russell's affidavit, the Smiths assert that paragraphs 6, 11, 16, 17, and 18 contradict his sworn deposition testimony and therefore, these paragraphs should

be stricken from his affidavit.[2]  In a general response, Delta Tau Delta argues that Russell's deposition merely expands and clarifies his eighteen paragraph affidavit.

As a matter of course, parties routinely present Trial Rule 56 materials in support of or in opposition to motions for summary judgment attempting to demonstrate that there is or is not a dispute of material fact.  *Kroger Co. v. Plonski*, 930 N.E.2d 1, 5 (Ind. 2010).  This is often accomplished through the presentation of affidavits by affiants claiming to have personal knowledge of the facts alleged.  *Id.*  It is quite ordinary and not at all surprising that the parties' affidavits or other Rule 56 materials compete with conflicting claims about the facts.  *Id.*  Affidavits submitted in support of or in opposition to a motion for summary judgment may be stricken for a variety of reasons, one of which is contradiction with the affiant's deposition testimony.  *Id.*

## 1. *Paragraph 6*

In Paragraph 6 of his affidavit, Russell affirms that "[t]he International Organization does not handle the affairs of local chapters."  (Appellant's App. p. 302). Contrasting this statement with Russell's deposition in which he explained the interaction between Delta Tau Delta and its local chapters, the Smiths assert that both statements are contradictory and paragraph 6 should be stricken.

At first glance, Russell consistently stated in his deposition that

[W]e do not tell [the local chapter] who they can pledge, who – you know, what people they elect to join the organization; we do not control their funds . . . we do not get involved in housing arrangements in terms of where they live; how many men to a room; all of those sort of – of things.

---

[2] Although the Smiths enumerate paragraph 11 as being contradictory to Russell's deposition, they omit any argument pertaining to it.  As such, the Smiths waived their claim relating to paragraph 11.

(Appellant's App. p. 242). However, a closer review of Russell's deposition testimony also reveals that Russell testified that Delta Tau Delta has a constitution, bylaws, and member responsibility guidelines that provide policies and rules "that speak to both individual and chapter expectations." (Appellant's App. p. 242). He stated that Delta Tau Delta requires its local chapters to comply with its rules and enforces its rules at the chapter level in a variety of ways. In addition, Russell admitted that Delta Tau Delta sends a chapter consultant to the individual chapters on a regular basis. During this visit, the consultant reviews the finances of the chapter and reports back to the national organization if any violations of the member responsibility guidelines are observed. We conclude that the outright denial of any interference in the affairs of the local chapter, as stated in paragraph 6 of the affidavit, contradicts Russell's more detailed deposition indicating an close interaction between Delta Tau Delta and the local chapter and therefore should be stricken.

### 2. *Paragraphs 16 and 17*

In Paragraphs 16 and 17, Russell affirmed that

16. The local chapters, pursuant to the International Organization's Bylaws, make their own decisions regarding alcohol use, in conformity with state, local and university/college laws and regulations.

17. Every chapter, consistent with their individual member's obligations under the law and per the Member Responsibility Guidelines, develops their own standards of behavior with regard to alcohol use and abuse.

(Appellant's App. p. 41). Asked about these paragraphs in his deposition testimony, Russell confirmed the statements and added that even though Delta Tau Delta allows its

individual local chapters to promulgate their own rules with respect to allowing alcohol on house premises and its use for those members over legal drinking age, these rules must be consistent with the organization's bylaws, member responsibility guidelines as well as state, local and university or college laws and regulations. Viewed in this light, we conclude that Russell's deposition testimony is more an elaboration of his affidavit, rather than an outright contradiction. Therefore, Paragraphs 16 and 17 were properly designated.

### 3. *Paragraph 18*

In Paragraph 18, Russell declared that "[t]he *only* enforcement power of the International Organization is suspending or expelling individual members or revoking chapters." (Appellant's App. p. 41) (emphasis added). Nevertheless, during his deposition, Russell admitted to several other enforcement powers. Specifically, Russell conceded that besides the enforcement powers enumerated in his affidavit, Delta Tau Delta could also impose fines on individual members, order a local chapter to attend additional educational training, temporarily suspend chapter operations, cease social events, and order the local chapter to refrain from using any alcohol for a certain period of time.

Delta Tau Delta responds that a distinction must be made between enforcement powers and sanctions. They assert that as such, Russell's affidavit speaks to the enforcement mechanisms of Delta Tau Delta while his deposition testimony elaborated on the organization's sanctioning power. We disagree. Although Delta Tau Delta's counsel introduces a distinction between enforcement and sanctions during the

deposition, the Smiths consistently questioned Russell on whether certain actions constituted enforcement powers by the organization. Therefore, Russell's categorical statement in his affidavit is contrary to his deposition during which he admits to the organization's additional enforcement mechanisms. As a result, the trial court abused its discretion by refusing to strike paragraph 18.

B. *Unsworn and Uncertified Statements*

As part of the evidence in support of its motion for summary judgment, Delta Tau Delta designated two unsworn, uncertified, and unauthenticated statements purportedly made by two freshmen to investigating police officers. In determining a motion for summary judgment, a trial court can consider only material deemed appropriate by Ind. Trial Rule 56(E). *Duncan v. Duncan*, 764 N.E.2d 763, 766 (Ind. Ct. App. 2002). That rule provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies not previously self authenticated of all pages or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

In ruling on a motion for summary judgment, the trial court will consider only properly designated evidence which would be admissible at trial. An unsworn statement or unverified exhibit does not qualify as proper evidence. *Kronmiller v. Wangberg*, 665 N.E.2d 624, 627 (Ind. Ct. App. 1996). Where the content of the uncertified exhibits is materially in issue, said exhibits will be insufficient and consideration of them is improper. *Wallace v. Ind. Ins. Co.*, 428 N.E.2d 1361, 1365 (Ind. Ct. App. 1981).

14

Because Delta Tau Delta's two designated statements were not attached to an affidavit and were unsworn and unverified, they cannot now be considered in ruling on a motion for summary judgment. *See Kronmiller*, 665 N.E.2d at 627.

Delta Tau Delta now attempts to circumvent the requirements of T.R. 56(E) by asserting that the statements are admissible pursuant to Ind. Evidence Rule 803(8). Indiana Evidence Rule 803(8), contains certain exceptions to the prohibition against hearsay and provides that:

> Unless the sources of information or other circumstances indicate lack of trustworthiness, records, reports, statements, or data compilations in any form, of a public office or agency, setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law. The following are not within this exception to the hearsay rule: (a) investigative reports by police and other law enforcement personnel, except when offered by an accused in a criminal case[.]

Here, because of its uncertified and unsworn nature, the precise characterization of the two statements is unclear. However, both statements commence with

> Today's date is Sunday the 5[th] of October 2008 time's approximately 11:50 AM. Speaking is Det. Sgt Bob Rivers of the Crawfordsville Police Dept., speaking from the interview room in the detective division of the Crawfordsville Police Dept. And I am speaking with [].

(Appellant's App. p. 43).[3] Although Delta Tau Delta asserts—without any citations to the designated evidence—that these statements are not investigative reports but merely "transcribed, oral statements" made to the detective "by two individuals with personal knowledge of the matters at issue," we are not persuaded. (Appellee's Br. p. 31). It is

---

[3] The second statement expresses a similar sentiment but is dated Wednesday, Dec. 3, 2008 and took place at the former Delta Tau Delta building on the Wabash College campus.

clear the statements purport to be an interview by a police officer of two witnesses pertaining to the events surrounding Johnny's death. As such, both documents fall within the provision of investigative police reports and are inadmissible as hearsay statements in accordance with Evid. R. 803(8). The trial court abused its discretion by denying the Smiths' motion to strike with respect to the two statements.

## II. *Motion for Summary Judgment*

In their amended complaint, the Smiths bring three claims against Delta Tau Delta. In Counts I and II, the Smiths allege violations of the hazing statute and the dram shop laws respectively. They assert liability on the part of Delta Tau Delta by way of an agency relationship with its local chapter. Specifically, they maintain that Delta Tau Delta, through the actions of their officers and agents at its local chapter, is responsible for the hazing of Johnny in violation of I.C. § 35-42-2-2 and continued to furnish Johnny alcoholic beverages at the Homecoming party resulting in Johnny's acute alcohol intoxication and death. With respect to Count III—a claim of negligence against Delta Tau Delta—the Smiths base their accusation on an assumption of duty, contending that Delta Tau Delta, "through their actions and promises to the parents of prospective fraternity members, assumed a duty to protect freshmen pledges, including Johnny, from hazing and excessive alcohol consumption which could result in bodily injury or death." (Appellant's App. pp 154-55). The trial court granted summary judgment in favor of Delta Tau Delta on all three claims. The Smiths appealed, maintaining that the trial court erred in issuing summary judgment for Delta Tau Delta because a genuine issue of

16

material fact exists with respect to the national fraternity's responsibility in all three Counts.

To be sure, we are presented with a very narrow legal issue today. The parties are not alleging that an actual violation of the hazing statute or dram shop laws occurred; rather, we are requested to determine whether the national fraternity assumed a duty to its pledges or an agency relationship existed with the local chapter which could propel Delta Tau Delta within the purview of liability if the perceived violations of the hazing statute and dram shop laws took place.

## A. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . ., or if the undisputed facts support conflicting reasonable inferences. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of

persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

We observe that in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *Id.* However, such findings offer this court valuable insight into the trial court's rationale for its decision and facilitate appellate review. *Id.*

### B. *Assumption of Duty*

First, the Smiths allege that Delta Tau Delta affirmatively assumed a duty to protect Johnny from hazing practices and the dangers of excessive alcohol consumption. A duty of care may arise where one party gratuitously or voluntarily assumes such a duty. *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999). An assumption of duty creates a special relationship between the parties and a corresponding duty to act as a reasonably prudent person. *Id.* Although the existence and extent of an assumed duty is generally a question of fact for the jury, it may be resolved as a matter of law if the designated evidence is insufficient to establish such a duty. *Id.* The Restatement (Second) of Torts Section 324A(b) (2d ed. 1965) provides that one who undertakes to render services to protect a third person is subject to liability to the third person resulting

18

from his failure to exercise reasonable care if he has undertaken to perform a duty owed by the other to the third person. "The actor must specifically undertake to perform the task he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully." *Am. Legion Pioneer Post No. 340 v. Christon,* 712 N.E.2d 532, 535 (Ind. Ct. App. 1999), *trans. denied.* This means that the defendant must have undertaken the duty both "specifically and deliberately . . . [I]t is also important that the party on whose behalf the duty is being undertaken relinquish control of the obligation; the party who adopts the duty must be acting 'in lieu of' the original party." *Griffin v. Simpson*, 948 N.E.2d 354, 360 (Ind. Ct. App. 2011), *trans. denied.*

Courts in all jurisdictions have addressed liability for fraternities stemming from injuries incurred on university or fraternity property with varying outcomes. The most prominent cases usually all involve activities surrounding initiation rituals, and more often than not, excessive fraternity-sponsored alcohol consumption.

In *Delta Tau Delta*, our supreme court held as a matter of law that the national fraternity did not gratuitously assume a duty to protect a female sexual assault victim during an alcohol party at the chapter house by sending a series of posters to the local chapter professing that Delta Tau Delta fraternity was a leading fighter against date rape and alcohol abuse. *Delta Tau Delta*, 712 N.E.2d at 975. In *Foster v. Purdue University Chapter, the Beta Mu of Beta Theta Pi*, 567 N.E.2d 865, 865 (Ind. Ct. App. 1991), we affirmed summary judgment in favor of the national fraternity and local fraternity association where an inebriated freshman broke his neck after diving into a waterslide at

19

the chapter house during a party. The court rejected Foster's argument that the fraternity association affirmatively assumed a duty to control the chapter members' conduct based on its execution of chapter by-laws, noting first that the association resolutions were recommended but not binding and that even if they were binding on fraternity members, Foster, as a member, would be contractually bound to control his own behavior. *Id*. at 871.

In contrast, the Louisiana Court of Appeals concluded in *Morrison v. Kappa Alpha Psi Fraternity*, 738 So.2d 1105, 1118 (La. Ct. App. 1999), *writ denied*, that based upon the national fraternity's complex hierarchical system for controlling its local chapters' charters as well as its knowledge of prior hazing incidents at the particular local chapter, the national fraternity had undertaken a duty to regulate that local chapter to the extent necessary to protect Morrison from hazing. The court noted that on the national level, the fraternity had the authority to approve or revoke a local group's chapter. *Id*. On a regional level, Kappa Alpha Psi had the authority to supervise the activities of the local chapters and administer discipline for rule violations. *Id*. Also, the national fraternity had adopted a level of regional officers who were charged with the responsibility of auditing local chapters for compliance with fraternity, university, and local criminal rules and regulations. *Id*.

The Smiths designated evidence establishing that Delta Tau Delta promulgated rules and enforcement procedures focused on hazing and alcohol abuse. The evidence supports that from its inception, Delta Tau Delta has focused on regulating hazing and alcohol consumption by its chapter members and increased its involvement in the local

chapters throughout the years, culminating in the detailed membership responsibility guidelines specifically dedicated to hazing and alcohol. Initially, Delta Tau Delta's rules prescribed the membership rituals to be carried out by the local chapters, its membership recruitment procedures, and the process to expel members who exhibit conduct unbecoming a member of the fraternity. With the compilation and enactment of member responsibility guidelines, Delta Tau Delta included specific provisions clarifying its position with respect to hazing, alcohol and drugs, and other abusive behavior. In particular, besides the general definition of hazing, the national fraternity elaborated that "[n]o member or pledge/associate/new member/novice shall permit, tolerate, encourage or participate in 'drinking games.'" (Appellant's App. p. 228). Together with these specific behavior provisions and their violations, Delta Tau Delta included enforcement criteria in the member responsibility guidelines, varying from suspension of the member to fines and educational programming, as well as an enforcement program, in which the national fraternity emphasized that it needs to be informed of "potential violations . . . as soon as possible by anyone with knowledge thereof either to the chapter advisor, division vice president, or to the Fraternity's Central Office." (Appellant's App. p. 231). At the conclusion of these guidelines, Delta Tau Delta included a verification program, in which each local chapter must certify presentation of the guidelines to its members and the "efforts made to comply with the implementation requirements." (Appellant's App. p. 232).

Subsequent to the initial adoption of the member responsibility guidelines, in August 1990, and restated in 2007, Delta Tau Delta added very detailed policy statements

21

on alcohol and substance abuse. In these statements, Delta Tau Delta mandated the completion by each new member by the end of his initiation term of an alcohol education program—GreekLifeEdu— as well as the collaboration between the local chapter and a local alcohol and substance treatment organization. At the same time, Delta Tau Delta instituted Delts Talking About Alcohol, an educational program required for all pledges on how to recognize the signs of acute alcohol poisoning. In addition, pledge family-oriented activities, alcohol at pledge activities, and drinking games—like the ones Johnny participated in during the Homecoming party—were expressly prohibited.

Although Delta Tau Delta enacted its comprehensive provisions on hazing and alcohol in its member responsibility guidelines, these are not mere guidelines as would be understood in common parlance in the sense of being voluntary. Rather, a sophisticated compliance and enforcement mechanism ensured acquiescence from the local chapters. Through its chapter consultants and chapter advisors, Delta Tau Delta remained apprised of the daily activities in their local chapters. Not only were chapter advisors required to report conduct violations, they also were responsible to ensure the local chapter complied with any enforcement and corrective mechanisms mandated by the national fraternity. More specifically, designated evidence reveals that the chapter advisor was present at the fraternity house on the evening of October 3, 2008 and again on the day of the Homecoming party.

While it is clear that the sophisticated nature of the rules and the lengthy, explicitly phrased member responsibility guidelines with its enforcement mechanisms indicate some oversight by the national fraternity in policing its collegiate chapters, there

remains a genuine issue of material fact whether this level of influence alone is sufficient to find that Delta Tau Delta assumed a duty to protect its pledges from hazing and excessive alcohol consumption. As such, the undisputed material facts support conflicting reasonable inferences which make the grant of summary judgment inappropriate. Therefore, we reverse the trial court's grant of summary judgment in favor of Delta Tau Delta.

C. *Agency Relationship*

In a related argument, the Smiths contend that the trial court erred in concluding as a matter of law that Delta Tau Delta is not responsible for violations of the hazing statute and the dram shop laws as it did not have an agency relationship with its local chapter. To be liable under this theory, an agency relationship must exist. *Foster*, 567 N.E.2d at 872. Agency is a relationship which results from manifestation of consent by one party to another. *Id*. The elements of agency are consent and control. *Id*. An agent must acquiesce to the arrangement, and be subject to the principal's control. *Id*. Where apparent authority is at issue, it must be initiated by a manifestation of the principal. *Swanson v. Wabash College*, 504 N.E.2d 327, 331 (Ind. Ct. App. 1987). In other words,

> the necessary manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. It is essential that there be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship.

*Id.* at 331-32.

23

In *Ballou v. Sigma Nu Gen.'l. Fraternity*, 352 S.E.2d 488, 496 (S.C. Ct App. 1986), the court recognized the fraternity's implied consent to the agency relationship with its local chapter after a pledge died of alcohol intoxication during a mandatory initiation party (hell night). Looking at the scope of the agency, the court focused on the following:

> Although Sigma Nu by-laws prescribe a formal, quasi-religious initiation ceremony, they do not prohibit an active collegiate chapter from supplementing the initiation process by requiring candidates for membership to participate in an additional initiation activity. In this case, the active collegiate chapter required candidates for membership to participate in hell night as part of the process of initiation into Sigma Nu.
>
> In initiating new members, the local chapter was accomplishing the purpose of Sigma Nu and was "about the business" of Sigma Nu. Indeed, as Justice Cothran observed in his concurring opinion in *Derrick v. Sovereign Camp, W.O.W.*, 115 S.C. at 443, 106 S.E. at 224, the introduction of new members "is the life blood of all such organizations." Because it was within Sigma Nu's interest that new members be received, we are satisfied that the local chapter in conducting hell night and in requiring the pledges to participate in hell night was a condition of membership in Sigma Nu acted within the scope of the apparent authority conferred on it by Sigma Nu.

*Id.*

Delta Tau Delta's constitution, bylaws, and member responsibility guidelines establish that the national fraternity prescribed rules and requirements for recruiting and initiating new members, and for approved conduct in daily activities. It explicitly prohibited the local chapter to engage in hazing, pledge family activities, and to provide alcohol to pledges. Deviation from these rules and guidelines is penalized by sanctions and suspensions. The national fraternity further controlled the activities of its local chapter with respect to hazing and alcohol consumption through its enforcement

24

procedures, implemented by the chapter consultants and advisors. There is designated evidence that the local chapter appeared to submit to and comply with the national fraternity constitution, bylaws, guidelines, and administered sanctions. As with the assumption of duty, we likewise conclude that there is a genuine issue of material fact whether an agency relationship existed between Delta Tau Delta and its local chapter.

### D. *Comparative Fault*

As an alternative argument, Delta Tau Delta contends that because the "undisputed evidence establishes that Johnny [was] more than 50% at fault for his own damages," the trial properly granted summary judgment pursuant to the Indiana Comparative Fault Act. (Appellee's Br. p. 24).

Under the Comparative Fault Act, liability is to be apportioned among persons whose fault caused or contributed to causing the loss in proportion to their percentages of fault as found by the jury. *See* I.C. § 34-51-2-8. Fault apportionment is uniquely a question of fact to be decided by the jury. *McKinney v. Pub. Serv. Co. of Ind., Inc.*, 597 N.E.2d 1001, 1008 (Ind. Ct. App. 1992), *trans. denied*. At some point, the apportionment of fault may become a question of law for the court. But that point is reached only when there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion. *City of Crawfordsville v. Price*, 778 N.E.2d 459, 463 (Ind. Ct. App. 2002).

We have not reached that point yet. Although the undisputed designated evidence establishes that Johnny was required to attend the Homecoming party and pledge family drink night, there is no evidence before us that Johnny either voluntarily or was forced to

consume the amount of alcohol he did.[4]  Moreover, even if the evidence reflected that Johnny was not mandated to consume alcohol, there is no evidence establishing that Johnny was made aware of that fact.  Based on the designated evidence, we cannot say that a factfinder could come to only one logical conclusion.

## CONCLUSION

Based on the foregoing, we hold that the trial court abused its discretion by admitting certain paragraphs of Russell's affidavit and by admitting two unsworn, unverified, and uncertified statements.  Additionally, we find that the trial court erred in granting Delta Tau Delta's motion for summary judgment as there is a genuine issue of material fact that (1) an agency relationship existed between the national fraternity and its local chapter and (2) the national fraternity assumed a duty to protect its freshmen pledges.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

BARNES, J. concurs

BAKER, J. concurs in part and in result with separate opinion

---

[4] Even though Delta Tau Delta points to evidence indicated that drinking was not a requirement for membership, we deemed this evidence to be inadmissible.

26

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STACY SMITH and ROBERT SMITH, Individually and as Co-Personal Representatives of the ESTATE OF JOHNNY DUPREE SMITH, deceased, | ) ) ) ) ) | |
| Appellants-Plaintiffs, | ) ) | |
| vs. | ) ) | No. 54A01-1204-CT-169 |
| DELTA TAU DELTA, | ) ) | |
| Appellee-Defendant, | ) ) ) | |
| BETA PSI CHAPTER OF DELTA TAU DELTA, WABASH COLLEGE and MARCUS MANGES, | ) ) ) ) | |
| Defendants. | ) | |

**BAKER, Judge, concurring in part and in result,**

While I concur in the result reached by the majority and in most of its analysis, I write separately to detach myself from a conclusion reached by the majority pertaining to the motion to strike. More particularly, regarding Paragraph 6 of Russell's affidavit stating that "[t]he International Organization does not handle the affairs of local

27

chapters," appellant's app. p. 302, I cannot agree that this is an "outright denial of <u>any</u> <u>interference</u> in the affairs of the local chapter," that Russell contradicted in his subsequent deposition testimony. Slip op. at 12 (emphasis added).

To be sure, Russell's deposition testimony is consistent with the statement in his affidavit that Delta Tau Delta does not handle the affairs of the local chapter. For instance, Russell testified that Delta Tau Delta did not tell the local chapters "who they can pledge . . . what people they elect . . . we do not control their funds . . . we do not get involved in housing arrangements . . . ." Appellant's App. p. 242. Moreover, I cannot agree that Russell's testimony regarding Delta Tau Delta's constitution, bylaws, and guidelines, coupled with the presence of enforcement mechanisms, directly contradicts his affidavit such that the trial court abused its discretion when it denied the Smiths' request to strike Paragraph 6.